Treat *v.* Strickland.

---

ROBERT TREAT *versus* HASTINGS STRICKLAND & *al.*

The second section of the repealing act in the Revised Statutes preserves not only actions, which technically and properly speaking had accrued by virtue of, or been founded on, the repealed statutes, but those also which were preserved and secured to a party by those acts.

Where one of two demandants in a writ of entry, pending at the time the Revised Statutes went into operation, afterwards dies, the Court has power to permit an amendment by striking out the name of the deceased, and otherwise amending, so that the action may stand as if commenced by the survivor alone.

The acts authorizing tenants in real actions to claim for the value of the improvements on lands, "holden by such person by virtue of a possession and improvement," require that such holding should be adverse to the legal title; and therefore a tenant holding under a bond for a deed from the owner, is not entitled to claim the value of such improvements.

The declarations of a former owner of land, made while he was proprietor of the estate, respecting the extent and boundaries thereof, are competent, though not conclusive evidence against those claiming title under him.

Treat *v.* Strickland.

Where the general issue is pleaded, and a brief statement of the special matters of defence, not embracing, however, non-tenure or tenancy in common, is filed, no actual ouster need be proved, as the general issue admits the tenant to be in possession of the premises as tenant of the freehold.

If land be conveyed, and at the same time a bond be given by the grantee to the grantor and another, conditioned to convey the same premises to them on the payment of certain sums at certain times, the instruments do not constitute a mortgage of the estate.

Where land adjoining on tide waters is conveyed " with the flats adjoining the land and appertaining thereto, meaning to convey only the flats of right belonging to said parcel of land," such flats only would pass as the law would determine to belong to that parcel of land, unless there be sufficient evidence to show, that the language was used by the parties in a different sense. If there be such evidence, the language must receive such a construction, as will accord with their intentions.

To explain the language used in conveying an estate, its actual condition and occupation at the time of that conveyance may be considered.

And the purchaser of land with flats appertaining thereto, must be presumed to have known the manner in which the flats had before been conveyed in deeds spread upon the records, and the manner in which they were occupied at the time of the conveyance.

THIS was a writ of entry wherein was demanded one half part of a tract of land in Bangor, bounded beginning in the easterly line of a twelve feet passage way leading from Hammond Street northerly to Kenduskeag Stream, 69 feet northerly from the North line of said Hammond Street as used in 1832; thence North 87½° East, 131 feet to the centre of the Kenduskeag Stream ; thence up said stream North 32° West, 166 feet; thence South 61½° West, 17½ feet to a 12 feet way ; thence on the easterly line of said passage way South 8° West, 136 feet to the place of beginning. Also one undivided fourth part of another parcel of land in Bangor, bounded beginning on Hammond Street 12 feet westerly from the southwest corner of T. A. Hill's store, as it was standing in 1832; thence easterly on the line of Hammond Street 23 feet; thence northerly at right angles to the centre of Kenduskeag Stream in the same direction with the side lines; thence down said stream to a point where the westerly line of a twelve feet passage way leading from said Hammond Street to Kenduskeag Stream extending in the direction as the side lines would strike

the centre of said stream; thence southerly on said passage way to the place of beginning.

The action was originally brought by Waldo Pierce and Robert Treat. During the pendency of the action, Oct. 10, 1841, Pierce died, and Treat moved for leave to amend by striking out the name of Pierce and otherwise amending, so that the action should stand as if commenced by Treat alone. The tenants objected, but the amendment was permitted by TENNEY J. presiding at the trial.

Each party filed exceptions to the rulings and instructions of the Judge. The Reporter has received the exceptions on but one side. It is believed that the rulings and instructions of the Judge, and such of the facts as are necessary to show their bearing, appear in the opinion of the Court.

The question presented by both the bills of exception were ably and elaborately argued' by

J. Appleton and W. Kelley, for the demandant; and by

J. P. Rogers, for the tenants.

The opinion of the Court was prepared by

SHEPLEY J. — The first question presented for consideration by the exceptions taken by the tenants, relates to the amendment. It was provided by statute, c. 186, § 3, that if either of the demandants should die during the pendency of a real action, his death should be suggested on the record, and that the survivor might amend the declaration by describing his interest in the premises, and proceed in the cause to final judgment. In the Revised Statutes, c. 145, § 19, there is a provision, that in such case the action shall not abate, but the Court shall proceed and determine the same after notice to the heirs. The forty-ninth section of the same chapter provides, that all real actions which shall be pending, when the chapter shall become a law, " shall proceed and be conducted to final judgment, or other final disposal, in like manner, as if this chapter had never been enacted." This action was pending at that time. It is insisted however, that the revised code repealed c. 186, and that there was no longer any statute pro-

vision authorizing the action to proceed after the decease of one of the demandants. In the second section of the act, which repealed that statute, there is a provision saving to all persons " all actions and causes of action, which shall have accrued in virtue of, or founded on any of said repealed acts, in the same manner, as if such acts had never been repealed." But it is contended, that this action cannot be considered as having accrued in virtue of, or to have been founded on the repealed act. A literal construction of the language would authorize such a conclusion. When the language is considered ·in connexion with that of the forty-ninth section of c. 145, and with the recollection, that the general purpose of the revision was to embody in a more systematic form the existing laws, with certain modifications and new provisions, without destroying existing rights ; there can be little doubt, that it was the intention of the legislature to preserve not only actions, which technically and properly speaking had accrued or been founded on the statute, but those also, which were preserved and secured to a party, by the repealed act. This intention is indicated by such actions being saved to them " in the same manner as if such act had never been repealed." The other part of that clause providing, that the proceedings in every such case shall be conformed, when necessary, to the Revised Statutes, cannot apply to this case, because it would be a violation of the provisions of c. 145, § 49, so to apply it. The amendment must therefore be considered as legally made.

The next question presented is, whether the testimony offered by the tenants to prove, that they and those under whom they claim had made improvements upon the premises, was properly excluded. It appears, that Samuel Smith conveyed the premises to the demandant and Pierce, on December 18, 1832. That on the same day they executed a bond to Edward and Samuel Smith to convey the same premises to them upon the performance of certain conditions. The tenants claim under a title derived from the Smiths or one of them, and especially desire to avail themselves of the value of the improvements made by Samuel Smith. The acts author-

izing tenants in real actions to claim for the value of the improvements made on lands "holden by such person by virtue of a possession and improvement," have uniformly been considered as requiring, that such holding should be adverse to the legal title. There is no testimony stated in this bill of exceptions tending to prove, that either of the Smiths, or any grantor of the tenants, held adversely to that title. From the testimony presented, the conclusion would be, that the Smiths entered by virtue of their bond, and if so, they were holding in submission to that title. But it is contended, if this be so, that testimony should have been received to prove, that they had subsequently denied that title and claimed to hold adversely to it. It does not appear to be necessary to enter upon an examination of this position, for the bill of exceptions does not state, that any such testimony was offered. It only states, that the tenants "called a witness to prove the value of the improvements made upon the demanded premises by them and those under whom they claim, particularly by said Smith." This testimony was properly excluded.

The next question presented is whether the agreements signed by Samuel Smith and others, made on October 10 and November 7, 1833, were properly admitted as testimony to prove the line of highwater mark. In these agreements Smith recites, that he was owner of one of the lots. He had before that time conveyed to Pierce and Treat one undivided half of one of the lots, and the whole of the other lot demanded, but he was at that time the owner of the other undivided half of one of the lots, by purchase from Dealing and Leavitt on April 25, 1833. The tenants claim under a title derived from him; and the acts and declarations of one, while he was an owner of the estate, respecting the extent and boundaries of that estate, may be received in evidence against those claiming title under him. *Human* v. *Pettell*, 5 B. & A. 223; *Adams* v. *French*, 2 N. H. R. 387; *Jackson* v. *Griswold*, 4 Johns. R. 230. These agreements were not received as binding and conclusive upon the estate, but only to show the acts and declarations of a former owner,

Treat *v.* Strickland.

while he owned a part of that estate; and for that purpose, they were properly admitted.

The jury were instructed, " that by the pleadings in this case no actual ouster need be proved." This is alleged to have been erroneous. The tenants had pleaded the general issue accompained by brief statements of certain matters in defence. Non-tenure or tenancy in common with the demandant, was not made a point in the defence by the brief statements; and they cannot be considered as presenting any matter of defence not stated in them. The general issue admitted their possession of the premises as tenants of the freehold. The decision requiring such proof from the demandant in the case of *Cutts* v. *King*, 5 Greenl. 482, was founded on the statute, c. 344, § 2, which was repealed by c. 63, and the instructions were correct.

The jury were further instructed, that the passage way referred to in the deed from Smith to Pierce and Treat, " extended from highwater mark, in the same direction and of the same width as on shore, upon the flats towards the centre of the Kenduskeag stream in a line at right angles with Hammond street, and that the line described in that deed, as being seventeen feet and six inches in length, went to the East line of said passage way as the same extended." The conveyances, by which it was created and preserved, extend the passage way only to the stream; and if it can be extended further, it must be by virtue of some right or title other than that derived from the language of these conveyances. And if by their true construction the land, over which it was located, did not pass to the grantees, but only a right of way over that land, it may be doubtful, whether the passage way can be extended in any direction over the flats. It is not perceived, that a mere right of way would be extended from high to low water mark in these tide waters by the ordinance of 1641; for that only thus extends the title of the owner of the adjoining upland. But it will not be necessary to decide, whether the passage way did or did not extend beyond high water mark, if the tenant were not injured or aggrieved by those instructions. And this will

depend upon the construction of two deeds. One from Billings and wife to Samuel Smith, made on July 10, 1832; and the other from Smith to Pierce and Treat, made on the eighteenth day of the following December. By the former the line of boundary of the first lot conveyed is made to extend " to the centre of Kenduskeag stream, thence up said stream to a point, where the easterly line of said twelve feet passage way would strike the centre of said stream." This point was to be found, not by an actual extension of the passage way into the centre of the stream. No such idea could have been entertained. Nor could low water mark have had any influence upon the extension of that line, for it was not to terminate at low water mark, but in the centre of the stream. As the line of the passage way upon the upland was to be extended to the centre of the stream, the inference necessarily is, in the absence of any proof to the contrary, that the line was to be continued straight to the point of termination. And the point of union of the two lines referred to, will be found independently of any passage way upon the flats, by extending the eastern line of the passage way on the same course to the centre of the stream. In the deed from Smith to Pierce and Treat, the northeasterly line of the lot, which in the former deed was described as running " up said stream," is described "thence North thirty-two degrees West, one hundred and sixty-six feet." This last description would seem, according to the map of the premises exhibited, not to extend that line so far up the stream, as it was extended by the deed from Billings and wife to Smith. From a lower point of termination the line of boundary by the deed from Smith to Pierce and Treat, turns " South sixty-one and a half degrees West, seventeen feet and a half, to said twelve feet passage." This last line is laid down upon the map, S. 85° 30m. W. 17 feet and 10 inches. The case does not explain, why it is made to vary so much from the line described in the deed. If it be possible to extend that line according to the description of the deed, and make it unite with a line made by extending the eastern line of the passage straight to the centre of the stream, it is

not perceived, that there should be any such deviation. If the deviation was made to make it unite with an actually existing "twelve feet passage," the propriety or necessity for doing so, is not perceived; for the deed from Smith to Pierce and Treat says, "being the same parcel of land conveyed to me by Caleb C. Billings and Betsey Billings by their deed dated July 10, 1832." Any or all the obscurities, which arise from the description in the deed from Smith will be explained by the description in the deed to him. And the point of union of the northeasterly and southwesterly lines of the tract conveyed by the latter deed has been already exhibited. The tenants do not appear therefore to have been aggrieved by the instructions on this point.

The Court does not consider, that the deed from Samuel Smith to Pierce and Treat, and their bond to Edward and Samuel Smith of the same date, constitute a mortgage of the estate.

The point made respecting the finding by the jury of the line of highwater mark, and respecting the form of their verdict, it will become unnecessary to consider.

The exceptions taken by the demandant present for consideration the question, whether he was entitled to recover an undivided fourth part of the flats contained within the side lines of the lot described in the second count in the writ, continued to low water mark, on the same courses as those lines ran upon the upland. The jury were instructed, that he was not so entitled. In the year 1825, Caleb C. Billings and wife appear to have been the owners of a tract of land, including the demanded premises, bounded easterly by the passage way, northerly by the Kenduskeag stream, westerly by the land of William Emerson, and southerly by Hammond street. They conveyed to Thomas A. Hill, on August 22, 1825, one undivided third part of that tract, describing the East line thereof as "perpendicular to the northern line of said street." This deed also says, "it is intended by this deed to convey all the right, which the grantors have to the flats adjoining the lot conveyed *in the same direction with the side lines and no*

*more."*   On the same day Billings and wife conveyed to Andrew W. Hasey the other two undivided third parts of that tract by a similar description, making a similar statement, that "it is intended by this deed to convey all the right, which the grantors have to the flats adjoining the lots conveyed *in same direction with the side lines of said lot and no more."*   Hill and Hasey divided that tract between them by deeds made on September 5, 1825.   And Hill became the sole owner of the easterly, and Hasey the sole owner of the westerly, part of that tract.   The line of division between their lots commenced on Hammond street fifty-two feet westerly from the south west corner of land conveyed in the year 1821 from Billings and wife to Hill, and extended at right angles with that street to the Kenduskeag stream.   Thomas A. Hill conveyed to Samuel Hudson and John R. Greenough, on September 15, 1829, the lot demanded in the second count in the writ, bounding it on the northerly line of Hammond street, twenty-three feet, and extending it between side lines at right angles with that street to the Kenduskeag stream.   The deed then says, "and I hereby also sell and convey to said Greenough and Hudson all the right and title, which I have to the flats adjoining the lot hereby conveyed *in the same direction with the side lines of said lot."*   Greenough conveyed to Samuel Smith on February 28, 1831, his half of that lot by a similar description of the lot, and in his deed says, "and I also sell and convey to said Smith one undivided half of the flats adjoining to the lot hereby conveyed *in the same direction with the side lines of said lot."*   Samuel Hudson conveyed to Arnold Dealing and Stephen Leavitt on January 22, 1833, his half of the lot by a similar description, and conveyed half the flats also "*in the same direction with the side lines of said lot."*   Dealing and Leavitt conveyed this half to Samuel Smith on April 25, 1833, by a similar description with one half of the flats "*in the same direction with the side lines of said lot."*   Before Smith had purchased this last half of the lot, he had conveyed the other half to Pierce and Treat on December 18, 1832, and after a similar description of the lot he says, "and also

hereby conveying one undivided half of the flats adjoining the land last described *and appertaining thereto meaning to convey only the flats, of right belonging to said parcel of land.*"

The argument is, that the flats appertaining thereto, and of right belonging to said parcel of land, can mean nothing more or different from flats, which the law would determine to belong to that parcel of land. And this will doubtless be correct, if there be not sufficient evidence to show, that the language was used by the parties in a different sense. If there be such evidence the language must receive such a construction, as will accord with their intentions. Some of the indications of a different intention are, that the flats adjoining the eastern side of the lot had been conveyed and held for seven years before that conveyance by a line at right angles with the street and on that course extending over the flats. That the flats on the westerly side of the lot had been conveyed and held by a like line for three years. That the grantees had been in possession of the land under deeds recorded. This would have the effect to disseize others, and to give them a seizin of the flats according to the bounds named in the deeds, whether they actually occupied the flats or not. Smith had purchased one undivided half of the flats, describing the whole flats as between the side lines of the lot extended on the same course over the flats. And when in conveying them he spoke of them as appertaining thereto, must he not have meant such flats, as had been appurtenant to and connected with the upland for several years? And when he described them as " of right belonging to said parcel of land," could he have doubted, that the flats, which he purchased with the land rightfully belonged to it; or have intended to attempt to convey by that language flats, which he had not purchased, and did not own, and to leave unconveyed a portion of the flats, which he had purchased with the lot? Such would be the result of a construction, that the deed conveyed such flats only, as the law, independently of all description of them, would assign to the lot. The case finds also, that the demandant " introduced evidence tending to show, that there was erected a wharf

below   highwater mark several years before the purchase made
by him, and between the side lines of the lot continued in the
direction of said lines." Here then was proof to the eyes of
both seller and purchaser showing, that a portion at least of
the flats so described had been occupied and considered as
appertaining to and rightfully belonging to the lot.   To ex-
plain the language used in conveying an estate, its actual con-
dition and occupation at the time of that conveyance may be
considered.   The purchasers also must be presumed to have
known the manner, in which the flats had before been convey-
ed in deeds spread upon the records, and the manner, in which
they were occupied at the time of the conveyance.   And it
cannot be supposed, that they would not have understood the
language of their deed to convey the flats, according, as they
had been occupied and described in former conveyances.
These considerations are esteemed to be sufficient to show,
that the intention of the parties was by the use of that lan-
guage thus to convey the flats, such flats, as the grantor had
purchased with the lot, and such, as had been partially occu-
pied for several years in connexion with the lot.

> *The exceptions of the demandant are sustained,*
> > *the verdict is set aside, and*
> > > *a new trial granted.*